13-1938 Paul DeCologero v. United States Appeal No. 13-1945 Paul DeCologero v. United States and 13-1946 John DeCologero v. United States Matthew Thompson for Paul A. DeCologero. This is a unique case where the evidence that was withheld directly affected, impacted the entire proceeding in this matter. It impacted the discovery phase, it impacted the investigation phase, and it impacted the trial strategy phase, including Paul A.'s decision to testify in this matter. The issue here was that no 302s contained information regarding Gigi Portala, who law enforcement... Excuse me. First of all, you refer to those 302s. The second 302 doesn't seem to say anything. Well, the no 302s, the second 302 relates to, I would say, it's the modus operandi, it's incomplete. But, I mean, if you read it just as a document, it's meaningless as far as this case is concerned. I know you want us to draw an inference from it that there's probably more there in the redacted portion and the government's sloppy in the way it uses 302s, but that document itself doesn't tell us anything about anything. Well, I believe even in its incomplete state, it goes to the modus operandi of Gigi Portala, and that modus operandi is what does he do with people that he thinks are going to be witnesses against him. And if you compare the first 302 with the second 302, the first 302 discusses Charles McConnell telling no, listen, if I tell you what happened, there's a chance that Gigi's going to try and kill you, because if he finds out that you know about this, he may try and kill you. So what happens in the second 302, that's exactly what happens. Counsel, isn't it a fact that in terms of the trial that actually took place, I mean, this was not a new theory of the defense that the Portala group was responsible for the trial, wasn't McConnell identified as a potential witness at trial, and I guess Naguera had passed away by the time of the trial, and Portala himself was identified, and that was an issue on appeal. So it's not like what is found in the 302 is news, and in fact, there were indications at trial that some of these witnesses would be called, but they weren't for various reasons. So how do you account for that fact? What's so new about this? Well, what's new and what's material about this is this is a witness who received a confession from Portala, and yes, the defendants knew that Portala was a target, it had been apparently leaked by law enforcement sources to the newspaper, and they tried to follow up through several discovery requests to receive more of this information. They tried to pursue this narrative during the trial, but it largely fell flat because they didn't have this piece of information, which is essentially the linchpin. It's the confession of Charles McConnell, who confessed to committing this murder with Jiji Portala. And so what happens in the trial is they try to make this connection to Portala with, for alleged to have also participated in the murder with Desenzo. Muse is in contact with Portala anywhere from 13 to 22 times in the days surrounding the murder. There's no evidence like that regarding Paul A., but you present that evidence to the jury, and it's sort of meaningless without this linchpin because it's just, what does this mean? How does it fit in? And at the end, it's up to the lawyers sort of to just argue this point. There were other instances where, for example, Mr. Shea tried to cross-examine Desenzo on his statements to a confidential informant, wherein he admitted that he was running guns for Jiji Portala, and that when the deal went bad, Jiji tried to overdose him with a bad dose of heroin. That's a fact in this case, that Desenzo ingested a bad dose of heroin and was effectively brain by the time the trial came to the point where he had to type in his testimony on a laptop. But so, they couldn't even follow up with the CI because the trial judge wouldn't disclose the identity of the CI. Now, if this information had been available to the trial judge to consider when considering the disclosure of the CI, the decisions on discovery may have been much different. She may have ordered not only the disclosure of the CI, but other FBI information. There's just a lot of information that could have been drawn. I mean, you can speculate about that until the cows come home, but the district judge herself on the habeas case said that whatever other defects this evidence might have, this Airtel, that it's not material in a Brady analysis, that it wouldn't have had any effect on the outcome of the trial over which she presided. So I presume that that included, that implicit in that is her belief that it wouldn't have had any effect on the way in which she had ordered the discovery of the case. Well, but when you consider what third-party culprit evidence that's ever been considered in the circuit courts, whether it's the recent case in the Sixth Circuit with Gumby Mitchell, whether it's Mendez-Artuz in the Second Circuit, or whether it's Bowen Maynard in the Tenth Circuit, when you have third-party culprit, legitimate third-party culprit evidence, it's always found to be material. And the circumstances of the evidence in this trial supported this materiality. It wasn't, this wasn't some John Doe who had no possible relation to the case. And this is, I would argue this is stronger than even the evidence in Kyle's where that was, it was essentially, it was essentially impeachment material of a legitimate third-party culprit. Here, this was the identity of a third-party culprit that was never, the defense were never able to develop in front of the jury. May I ask you this on, going to the prejudice point, is it correct that in the habeas proceeding you did not either call no as a witness or present an affidavit from no as to what she would testify? We did not present an affidavit. Is that something that we ought to consider in reviewing your showing of the prejudice prong? Well, I don't think so, because I think where that would have been developed, first, the judge never ordered affidavits, the government submitted affidavits on their own. Well, you're the one who's bringing habeas, the judge doesn't have to order it. And that could have been developed in an evidentiary hearing, but... But you're trying to make the case that there has to be an evidentiary hearing. Wouldn't the submission of that kind of affidavit that Justice Soon is referring to enhance your case, that there should be an evidentiary hearing? I mean, the judge says, well, this is all hearsay, what she says McConnell said, no way to know whether she would confirm what is said in that 302. You had an opportunity to convince the judge that at an evidentiary hearing, she might be prepared to testify in conformity to that 302 report or even go beyond it, but you never made the effort to do that. No, I mean, that's correct. I'm sorry? You may answer that question in your time zone. We did not present that to the district judge, and I have no explanation for it other than that the report sort of speaks for itself, and whatever her affidavit would have said, whether she would have said something different from the report, she could have been easily impeached with the report. So it's a recorded statement, it's not under oath, but it's certainly a recorded statement that she could have been impeached with. Thank you, counsel. Thank you. Good morning. May it please the court, Jean Camthorne for Paul DeCaligero. I have only a few minutes, so I would like to focus first, if I may, on the scope of the government's obligation to inquire as to the existence of material exculpatory evidence. You do agree that if the district court's finding of no materiality is supportable, that we never have to decide the issue of what the scope of the government's obligation is? That is true, Your Honor, but I don't believe that her finding on materiality is supportable, and I do want to get to the issue of materiality as well, especially with respect to my client. What I think is clear from the recitation in the briefs about the history of the discovery in this case is that the prosecution tried very hard and successfully so to delimit its obligation to a team, which it defined itself and ignored accessible and really obvious sources of additional evidence. I think in doing so, it ignored what Osorio says is the appropriate scope, which is a responsible inquiry of those in a position to have relevant knowledge. That would be the FBI and the state police in this case. What about the, and I forget where the quotation, which case the quotation came from, but the reference in at least one other, and I think there were two other First Circuit cases, that seem to identify the scope of that inquiry to what the, by use of the phrase, the trial team. What is your response to that? I think that you have to look at that language in the context of the facts of those cases, Justice Souter, and none of those cases is comparable to this case. Here you have, and I think it is material to the question of the scope of inquiry, that there was a specific request for the information. So they're on inquiry notice, even if that is not relevant to the question under Bagley any longer and so forth. It's nonetheless, sorry Judge. So in a drug case or a RICO case, if a defendant files a Brady request and asks the government to search the records of every cabinet department, Department of Agriculture, Department of Commerce, the government, that somehow enlarges the scope of the inquiry? No, I don't believe it does. The defendant's request doesn't have much to do with it, does it? I don't think it does. Your Honor, you're right. It wouldn't because it's not a reasonable request. But when the request is pinpointed, when it is, Judge, this came out of the FBI, are they looking at the FBI? Have they asked the FBI? We're getting stuff piecemeal from the FBI. We find out that there are tapes. We find out that a gun has been turned over, et cetera. Tell me they're looking at the FBI. That is very different from the suggested facts, Judge Selye, that you pose. So I think Osorio is the right rule. I think all the cases that Judge Zobel relied upon are readily distinguishable. Either they were in the hands of the state or it was impeachment material. The prosecutor said no reason to expect existed, like mental health records, or they were details of a deal with another agency, prosecuted in another district. I mean, clearly, not something one would have been on inquiry notice of, and here that's not the case. Here there was, more than inquiry notice, there was specific requests for specific material. I would like to move on, in light of the time, to the materiality question and get back to the questions that you asked, Mr. Thompson, concerning whether we should have introduced an affidavit of Michelle Noe. I'm not aware of any obligation that we do so, even if Michelle Noe were at this point unavailable. That doesn't change whether there was a Brady violation in the course of trial. We don't- But it goes to the question of prejudice, and the question of prejudice, it seems to me, is distinct. The question of the prejudice in this instance is whether or not it was material, and whether or not it would have had, had it been disclosed at the time that it should have been disclosed, would it have had an effect on the reasonable probability, not even a preponderance, but some effect on the outcome of the case, and Bagley says, and on the strategy and the preparation for trial that the defense would then pursue. The answer is yes. At every turn- Don't question the defense would have pursued it. That isn't the issue. The issue is, do we now have a source of information as to whether, had she been called, had the defense pursued it, she would, in effect, have said, oh, that really isn't so, I was making that up, he didn't come in with blood all over his hands and say such and such. We are in a position, at least now, to inquire into that degree of prejudice and make a more informed materiality determination than could have been made, you know, prior to the habeas. If I may respond, Justice Souter, I don't believe in determining the materiality that the court should inquire as to whether she would hold up as a witness, whether she would appear, et cetera. You don't think the court can take into account the reliability, presumptive reliability of a statement? If it's facially unreliable, I think if it were, for example- Here it's double hearsay. It's the unsworn statement of one individual about what some other individual, also unsworn, allegedly said to her. Had the prosecution turned this over back in 2004, as it should have, then the defense would have been in a position to call Michelle Noe to trial, and you call it double hearsay, but McConnell's statement is a statement against interest, McConnell was eventually killed, McConnell would have been unavailable, Michelle Noe, her evidence would have been admissible, and I say, you look at it at 2004, how would it have affected the course of the trial and the course of the preparation at that time? As for it being new, if I may say, Judge Lopez- Well, I think we're going to take an item of brief at that point, unless Judge Lopez wants to open it up for questions. Thank you, you're addressing appropriately our questions about Judge Zobel's lack of materiality finding, but I thought you had a somewhat narrower position, which was that she could not make that determination in the absence of an evidentiary hearing. I thought your primary focus here today is that she should have held an evidentiary hearing before making the determination of the absence of prejudice. Isn't that, am I correct in understanding her position to be that? Yes, but not the converse. In other words, she can't throw out the immateriality without a hearing, but I don't think she needed a hearing to determine that it was material. I think it is on its face, but how do you decide that it isn't material? How do you not have a hearing? How do you not say that the affidavits that are on file don't rise to the level of a question, so that you must have a hearing before you deny it? I think there isn't a case that I'm aware, and I defer, I won't call myself an expert in the area, but I don't believe there's a case where plausible other culprit evidence, not an anonymous tip, not a stray comment, not something that has no clear grounding on the face of it, has ever been called immaterial. Thank you, counsel. Thank you. Sorry, Judge. Good morning, Your Honors. Mark Schaefer, John, Jr. As to whether Michelle Noe should have had an affidavit, we should have had one from her, I do hope the Court will keep in mind that my client was in a prison in Virginia filing a habeas petition on his own. The real question is why we didn't get... I'm struggling with the notion of how your client is involved in this at all. Your client wasn't, unlike the other two defendants, your client wasn't charged with the witness tampering count or the murdering aid of the witness tampering or anything related to it. Well, here's why, Judge. For one, when the First Circuit heard our original appeal in this matter, they opined that even if we had gotten a severance, which we should have, but the Court found we shouldn't, that the evidence of the Silva murder would have come in against us anyway as being part of the conspiracy. So as far as I'm concerned, in terms of materiality as to my client, if I stood here and I had the fair trial that I wanted to have, where I wasn't saddled with Paul A. as an albatross acting out in court as is documented in the First Circuit opinion, and I hadn't been saddled with the Silva murder, I believe I would have brought home not guilties on most of all the charges against my client, because if you look even back at the First Circuit opinion in this, the IDs in the case, when you break down each allegation against my client, it is hanging by a thread, and the IDs are contradictory, they don't hold up, they're horrible. We had strong defenses. It's the prosecution and the courts that decided that my client should be with Paul A. and with the Silva murder. So now it seems to me disingenuous and just frankly wrong to say that it's not material to my client, now that it might help him. It's like while we're sinking you, all this stuff comes in against you. And it's a 39 day or 40 day trial, and it's where I have to deal with that murder. It is the thing looming over the entire case along with Paul A.'s conduct. The thing courts don't really take into account is the theater of what we're dealing with in this trial, which is I'm trying to say this gentleman Paul A. isn't running the conspiracy, and he's acting out the whole time trying to run things. But that's another matter. It's clearly material to my client, and if you look at the case itself, attacking DeCenzo, attacking Reagan, and attacking Mercer, who's the lead agent in the case, were critical to everything involving John Jr. And if the murder comes down, if evidence on the murder comes down or falls apart, everything that DeCenzo and Reagan say falls apart, thus all of the charges against my client fall apart. Because without them, there's nothing against John Jr. effectively. Because you're left with the problematic IDs in Pesatoro and Secorso, which are referenced in the First Circuit original decision on this case, and where they do thoughtfully go through and acknowledge what was happening at the trial, which is these witnesses are presented with lousy photo arrays where it's not sequential. I mean, I will point out that even in the intervening time since that case, we've even come further on the idea of ID and things, and how it's to be done effectively. And my client is identified in two of those cases for which he's convicted in photo arrays that the court basically finds there's only two photos that match up, meaning there's only one other photo besides my client that is even close to how he looks. So my point is that those convictions are hanging by a thread. And I think we could have beaten those. And if you let in this those critical witnesses, meaning DeCenzo, Regan, Mercer, and how this case was handled, it would change everything for John Jr. And there's a real possibility that he is innocent of those things. You know, what really goes on in this case is that they suppressed, the government again and again said to Judge Zobel, don't make us look, don't make us get this information. And we asked for it, and they again and again declined to do it. Okay. Thank you. I appreciate the time. We'll hear from the government. May it please the Court. Jennifer Zatch from the United States. I'd like to first focus on the issue of materiality. And materiality means something very specific in the context of Brady and of a 2255. It means the defendant has to show a reasonable probability that had this evidence been disclosed, the result of this proceeding would have been different. Well, it has to prove that to the extent of showing that the confidence in the soundness of the verdict would in fact be undermined. It does not have to prove to a degree of probability that there would have been a different verdict. No, I think a reasonable probability had it been disclosed, the result would have been different. I think an alternative way is exactly how you expressed it, Justice Souter, that the confidence in this verdict would be undermined. Is this a verdict worthy of confidence? And here, the District Court, which presided over the 43-day trial, concluded that no, in the case of Brady, there was no material. And when you're considering materiality, you've got to look at sort of two factors. One, you're looking at the weight and the quality of the evidence at trial, which the District Court in this case characterized as overwhelming. And understandably, that's not something that's been discussed in the defendant's presentation, so I'd just like to briefly touch upon it here. There was testimony by numerous witnesses, by victims, by Paul A. himself. This testimony included statements made by Paul A. to others confessing to his participation in the murder. There was physical evidence. There were videos from the store. There were sale receipts. There was DNA evidence confirming that this murder took place precisely the way the government witnesses suggested that it did. So given that overwhelming weight, and that's one thing that the District Court quite appropriately considered, there's not a reasonable probability that the result would have been different. It doesn't undermine confidence in the verdict. And the flip side of that, of course, is looking at the weight and quality of this new evidence. And here, I think one crucial factor is one alluded to by Judge Lopez. This is not a new theory of the defense. Not only were there newspaper articles, did these Portala, DeGara, and McConnell appear on defense witness lists. There was an attempt, although untimely, to call Portala as a witness at trial. The defendants apparently decided in the end not to do so. And in fact, the testimony and the evidence in the record was the defendants themselves directed or others to spread rumors that Portala and his associates were responsible for the murder of Silva. The testimony was that Paul A. told Reagan to say that, the testimony was that John Jr. said that he was responsible for the murder of Silva. And he said that Silva was last seen with DeGara, characterized as Portala's hit man. So in other words, the counsel, I mean, their view is, yes, they had a theory about the involvement of Portala and his group in much of this criminal activity, including the murder that was at the heart of the case. But here, for the first time, they have a witness who would be prepared to describe an account of somebody in that group that they always thought was responsible for the murder, confirming that, yeah, I participated in that very murder with Portala. I mean, it's a, it seems like it's evidence, first evidence, from their point of view, that would confirm a theory that they were trying to substantiate because they were frustrated in discovery they sought in pursuit of that theory. Well, I think, I mean, I think that's right. And the government certainly concedes that this specific information was not available. But the information available to develop the theory that Portala and his associates were, in fact, responsible for the murder was completely available to the defendants. And they chose not to pursue it, apparently, as a matter of trial strategy. In other words, it was a tactical decision, not a lack of information. Specifically, give me an example of what they chose not to pursue. Well, I think on the first appeal, John A.'s claim as part of, I think, an ineffective assistance of counsel was that his counsel should have, trial counsel should have given additional emphasis to Portala, I think, characterizing him as the missing link in the murder. And this court held- But that's a, basically, a claim that counsel didn't present the case very well, didn't argue very well. Is there any witness, is there any evidence that you would point to that they knew enough to pursue and chose not to pursue? Well, yes. I think the fact that they elected not to call, and in the end elected not to call Portala, despite the fact that it was an untimely attempt to call him. And that seems to me the key, if, in fact, they wanted to pursue that strategy, that seems to me one of the key elements of doing that. Well, they would have pursued him, and he would either have said, no, I didn't do it, or he would have taken the fifth. And that would have been the end of that. Well, perhaps. I mean, in fact, he did submit, in this case, an affidavit stating that the defendant submitted in the discovery phase, saying that he was under investigation for the murders. Well, counsel, they identified McConnell as a potential witness for reasons that I don't think are explained in the record. McConnell was not called. It's hard to imagine that if they had had the benefit of this 302 report, they would not have made every effort imaginable to call McConnell. Now, what the outcome of that would have been, we don't know. But certainly, in light of this report, McConnell was put front and center in the murder of Ms. Silva. Well, yes, on its face. And I think that's... So how could that not be material? Well, again, materiality in the context goes to the whole proceeding as a whole. And given the other evidence that I've outlined that suggested, in fact, no, that Portala and his associates were not responsible. But in fact, responsibility for these crimes, the other crimes, including the murder, rested squarely with Paul A. and the Tocalegero group, has to be considered, as the district court did, where that evidence is overwhelming, where you have a uncorroborated, double hearsay report under someone who, within the context of her statement, is saying she was under the influence of crack cocaine, her boyfriend or ex-boyfriend McConnell was revived from a heroin overdose. I mean, this evidence, when weighed against the overwhelming quantity of evidence that came in at trial, is simply not enough to shift this into a verdict that is not worthy of confidence. So, does it summarize the government's position, because I'm struggling to get a handle on just what you're saying, that even though this was a lead that the defendants didn't have, that there's... it's sufficiently doubtful that this lead would have led to anything as not to undermine confidence in a verdict that was based on the overwhelming evidence that the government presented? Is that kind of what you're arguing? Yes, yes, Your Honor. I think that's right. For a number... the evidence that was presented that did link... that did support the verdict was overwhelming, and this new evidence, for a variety of reasons, is not sufficient to undermine that overwhelming amount of evidence that was presented. And I think one of the reasons, as we discussed in our brief, goes to sort of the standard of review. Though, of course, the ultimate question is de novo whether or not there's been a Brady violence, whether there's been prejudice. I think some deference should be given to the fact-bound determination of the district court that sat through this 43-day trial that heard the evidence, that saw the testimony, that could evaluate it in ways that really are unavailable to us looking at a cold record. And so, again, while the review is de novo, that determination, that really wouldn't have made a difference. No reasonable probability of a different outcome. No undermining by the district court should be given some deference, and that is also why the district court did not abuse its discretion in not holding an evidentiary hearing. The evidentiary hearing wouldn't have shed any light on that crucial question, which really was dispositive of this case, which is what effect this would have had had it been available to the defense at the time of the trial. The evidentiary hearing, in my view, would have been less relevant to the question of materiality. It might have been highly relevant, however, to the scope question with respect to whether or not anyone in the prosecution team knew about the, that the FBI had a parallel investigation and had records that might help the defense. If this case turns on the scope issue, then the evidentiary hearing might very well have been helpful, right? Well, the evidentiary hearing, I think, could have only discussed really that issue, and of course, that's an issue that this court need not reach, because materiality is fully dispositive of this case, but it just... Counsel, would you, I realize we don't have to, we don't have to reach it, perhaps because of the materiality issue, but wasn't Judge Zobel simply wrong to accept the affidavits of the Assistant U.S. Attorneys and the officers involved to the effect that they did not have any of this information? The, wasn't she required to accept as true the allegations that they did have this information, or should have, unless they were inherently incredible? I don't understand how she could accept those affidavits without an evidentiary hearing. I just don't understand that. Well, I don't think it's just the affidavits. I think it's the context of the case as a whole, looking at the documents as well, and if the documents on their face viewed in context, in combination with the affidavits, show that these were not in the possession of the agencies actually involved in the prosecution, which they were not, then there's no real point in having an evidentiary hearing to determine what's clear from the face of the documents, and any allegations to the contrary are inherently incredible. And here, you know, the, although these documents, it's very mysterious. Where did these documents actually, how did they come in the defense of possession? Where did these base stamps come from? It's very mysterious. But this kind of mysterious thing suggests in and of itself that they were not in the possession of the prosecution team. The government has taken a very consistent position in this case, I think it's borne out by the documents themselves, that the FBI was not an agency involved in the investigation of the Silva murder. And if you look at the face of this document, it doesn't even mention the name Silva. The context, it was a statement taken from someone who had just been arrested for participating in a bank robbery. That it's in an FBI file suggests that it's part of a bank robbery investigation, not an investigation of a murder. And there's no other suggestion that there was some parallel investigation going on. Indeed, that's another reason that sort of undermines the way, the credibility to be given to this evidence is that Noe had every incentive to fabricate a story given her arrest for entirely unrelated crime. So in other words, nothing suggests on the affidavits, the documents on their face suggest that these were in the possession of the prosecution team. And given that, the district court quite properly concluded they were not. But as I said before, it's not a question this court needs to reach. Materiality is fully dispositive of this case. Unless the court has further questions, I would rest on our brief for the remainder of our arguments. Well, thank you. I thank all counsel of this complex case and it's been very well argued. We'll take it under advisement.